ESTHER KOLODNEY, ADMINISTRATRIX (ESTATE OF
SAMUEL KOLODNEY) *v.* KOLODNEY BROTHERS,
INC., ET AL.

SUPERIOR COURT    HARTFORD COUNTY    FILE No. 113511

Memorandum filed April 24, 1959

*Ralph C. Dixon,* of Hartford, with whom was
*Abraham Silver,* of New Britain, for the plaintiff.

*Joseph Adinolfi, Jr.,* of Hartford, for the defendants.

PHILLIPS, J.    This was a companion suit with
*Esther Kolodney* v. *Kolodney Bros., Inc.,* Superior
Court, Hartford County, No. 110478, and *Esther
Kolodney, Administratrix* v. *Abraham Kolodney,*

Superior Court, Hartford County, No. 110480, and the three suits were tried together. It was agreed by counsel that the evidence in each of these suits should be considered by the court in the other suits so far as relevant and admissible, and particularly that evidence affecting the credibility of witnesses in any one suit could be considered by the court in weighing the credibility of those same witnesses in the other suits. The three memorandums of decision should be read together.

This action is by the administratrix of the estate of Samuel Kolodney, who died October 9, 1953, claiming damages for the conversion of 500 shares of stock in the Kolodney Brothers, Inc.

The Uniform Stock Transfer Act (Rev. 1958, § 33-75), so far as material, provides that "[T]itle to a certificate and to the shares represented thereby may be transferred only by delivery of the certificate endorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby." Under "Definitions" (§ 33-72), "delivery" means voluntary transfer of possession from one person to another, and "transfer" means transfer of legal title.

In July, 1932, The Kolodney Brothers Hardware Company, now Kolodney Brothers, Inc., was organized with a capital of 1500 shares. On September 1, 1932, 500 shares were issued in the name of the Kolodney brothers, Samuel, Ralph and Abraham, there being 10 certificates for 50 shares issued to each one. Then, or shortly thereafter, each of the brothers indorsed at least nine of his ten certificates in blank. The main issue is whether Samuel Kolodney transferred his stock to Abraham on May 4, 1953. I find that there was no delivery of Samuel's stock to Abraham on that date. I do not credit the testimony of Abraham and Ralph that prior to that

date Samuel told them of his intention of turning over his stock to them so that if he died his wife would not wreck the company. I do not credit their testimony as to what happened on May 4, 1953, at the Kolodney store. Possibly Harry Ganz, a brother-in-law of Ralph Kolodney, was asked to and did witness Samuel's signature on that date, for some devious reason of Samuel's, the signature having been made back in 1932, but as to the all-important fact that Samuel delivered the stock to Abraham in payment of a twenty-six-year-old debt for $16,666, I find that this was not so. My reasons follow.

For the reasons set forth in my memorandum in *Esther Kolodney, Administratrix* v. *Abraham Kolodney,* Superior Court, Hartford County, No. 110480, first count and third count, I do not deem the testimony of Ralph and Abraham worthy of credit, and proof of the alleged transfer of May 4, 1953, depends solely upon the testimony of these two men. The assignment to Abraham Kolodney on the back of the certificates was written by Ralph, not by Samuel. It was testified that Samuel was present during this entire transaction. If so, in a matter of such importance, why did he not fill in the assignment himself? The stock was not transferred on the stock transfer book of the company until May 14, 1954. While this is not necessary to effect a transfer under the Uniform Stock Transfer Act, nevertheless the fact that it was not done until long after Samuel died is evidence that no transfer was ever made. Samuel was actively engaged in the affairs of the corporation up to the time of his death and continued to act as president and chairman of the board of directors. This is attested to by the corporate minutes, the annual report and the corporation income tax return, all subsequent to May 4, 1953. The General Statutes (Rev. 1949, § 5156 [Rev. 1958,

§ 33-37]) and the by-laws of the company provided that every director shall be a stockholder. It is unlikely that Samuel, even though he may have had differences with his wife, as claimed, would have taken a step which would have deprived both his widow and his son of all interest in his business upon his death. There is missing, from Samuel's ten certificates, one certificate for fifty shares. It is inferable that Samuel only signed 9 certificates for a total of 450 shares when he and Ralph pledged 900 shares of this stock to Abraham on December 5, 1932. Thus, there would only be nine signed certificates available which Abraham could claim were transferred to him on May 4, 1953. Yet the testimony of the brothers is that all of Samuel's stock was transferred to Abraham on that date. Neither Esther Kolodney nor the attorney for the corporation, Leo Gaffney, nor the corporation accountant, Max Epstein, were made aware of any transfer of stock from Samuel to Abraham.

From all the above I find that there was no delivery of Samuel's 500 shares of stock in the corporation to Abraham on May 4, 1953.

As to the pledge of December 5, 1932, I find that this was not a bona fide pledge, but a device to remove the stock from the reach of the creditors of Samuel and Ralph. It was made over six years after the debt which it was supposed to secure. The year of the pledge was a depression period, and it is apparent that Samuel and Ralph were being pressed by creditors. The mortgage and note of their mother, Dora Kolodney, to the Commercial Trust Company for $50,000, upon which Samuel and Ralph were guarantors, was overdue and the mortgagee was in receivership. The receiver was making demands upon Samuel and Ralph for payment. Abraham was not a guarantor of this note. This assignment of stock was for a fictitious indebtedness, for

the purpose of protecting the stock from creditors. There is no reflection of any such indebtedness in the S R and A account, and the three brothers made equal withdrawals from it. This transaction was analogous to that of Abraham in 1942 when he executed a mortgage on his house for $9000 in favor of Samuel when, as Abraham admitted, there was no real debt but the mortgage was executed to remove the equity from the reach of creditors in the event that Abraham should be sued.

Even had the pledge been bona fide, it had ceased to exist. It does not appear that Abraham ever made any demand upon Samuel for the money, or that there was ever any sale of the stock to satisfy the pledge. Moreover, and conclusively, the pledge, if it existed at all, was terminated. Abraham himself testified that he took possession of the stock at the time of the pledge (1932) but later put it in the safe in the store. The safe was a common one, used by the three brothers. Abraham also testified that at the time of the claimed delivery, May 4, 1953, Samuel "handed the stock over to me and he said 'This is your stock,' and I put the stock in my pocket." While, as above stated, I do not accept Abraham's testimony as to what took place at that time, he can hardly claim that he retained possession of the pledged stock and, when it suits his convenience, say that Samuel handed it over to him. I conclude that at some time, probably when claims of creditors became less pressing, the pledged stock was returned to Samuel. Delivery back of the possession of the thing pledged terminates the pledgee's title. Jones, Collateral Securities & Pledges (3d Ed.) § 40, p. 52, and cases cited. A pledge is a lien upon the property and not legal title, and the legal title remains in the pledgor. Id., § 7, p. 11. It is not clear whether the defendants rely upon the pledge as conferring title to the stock upon Abraham

or merely as evidencing a debt which was paid by the transfer of stock on May 4, 1953. The pledge does not avail the defendants for either purpose.

As to demand and refusal to establish conversion, no demand is required if the taking, as in the present case, is tortious. *Thompson* v. *Rose,* 16 Conn. 71, 83; *Pond* v. *Skidmore,* 40 Conn. 213, 222; *Flaxman* v. *Capitol City Press, Inc.,* 121 Conn. 423, 429; *Moore* v. *Waterbury Tool Co.,* 124 Conn. 201, 211. In any event, the filing of a general denial does not raise the issue. *Atlas Assurance Co.* v. *Gibbs,* 121 Conn. 188, 195.

It is claimed that the plaintiff was not a duly qualified administratrix for the purpose of bringing these suits. The argument seems to be based on the assumption that the plaintiff should have been appointed administratrix de bonis non. Such an appointment occurs only when the original fiduciary has resigned, died or been removed. The office of the original administrator does not terminate during his lifetime unless he is removed. 2 Locke & Kohn, Conn. Probate Practice, § 337. The plaintiff was the proper party to bring this suit. *Davis* v. *Weed,* 44 Conn. 569, 577.

A corporation which issues a new stock certificate to the holder of an old one indorsed in blank, knowing that the holder is not the owner, is liable to the true owner. *Wilson* v. *Shear Co.,* 284 S.W. 654 (Tex. Civ. App.). The knowledge of Ralph Kolodney, president and treasurer, and Abraham Kolodney, a director, both in active charge of the business, as to the true facts was the knowledge of the corporation. Both the corporation and Abraham Kolodney are guilty of conversion of 500 shares of stock.

Judgment may enter against the defendants, Kolodney Bros., Inc., and Abraham Kolodney, in the amount stipulated to be the value of 500 shares

on October 9, 1953, $55,500, plus interest at 6 per cent from that date to date of judgment, $18,722, a total of $74,222, and in favor of the other defendants.